BRILEY *v.* CHICAGO, ROCK ISLAND AND PACIFIC RY. CO.

5-1827                                                            323 S. W. 2d 934

Opinion delivered May 11, 1959.

[Rehearing denied June 1, 1959]

*Cooper Jacoway,* for appellant.

*Wright, Harrison, Lindsey & Upton,* for appellee.

GEORGE ROSE SMITH, J. This is a suit by the appellant, C. H. Briley, for specific performance of an option agreement by which the appellee agreed to sell Briley 7.53 acres of land. Apparently the land has increased in value, so that Briley is anxious to buy at the contract price, while the railway company is reluctant to sell. The chancellor held that Briley, during the life of the option, failed to fulfill its conditions and hence did not become entitled to buy the property. The correctness of that holding is the only issue on appeal.

There is almost no dispute about the facts. For some years Briley and several other wholesale produce dealers were engaged in business in the same block in central Little Rock. Certain city health regulations made it necessary for these dealers to find a new location for their markets. The appellee owned a large wooded tract of land in the southeast part of the city, which it wanted developed in such a way as to create railway business. After extended negotiations, during which Briley at first requested 15 acres, the appellee sold Briley 7.53 acres on November 17, 1952.

Briley had not yet begun to improve the tract just mentioned when the parties, on October 30, 1953, executed the option agreement now in issue. This contract recites Briley's earlier purchase of 7.53 acres and gives him the right to buy an adjoining parcel of the same size for $5,647.50. But to take advantage of the option Briley was required to comply, not later than December 31, 1955, with this language in the agreement:

"'Briley shall have no right to exercise this option and Rock Island shall not be obligated to convey until there is constructed on the lands heretofore conveyed by Rock Island to Briley . . . a building or buildings containing a total of at least 28,000 square feet of concrete floor space, and requiring railroad trackage and service, the building or buildings to be constructed sub-

stantially in accordance with [a specified architectural drawing] . . . All such buildings shall be built at railroad car height."

By the spring of 1955 Briley and two other produce dealers, Ambort and Gachot, had built four warehouses on the tract. It is conceded that these buildings contain the required floor space, that they conform to the architectural drawing, and that they were built at railroad car height. The sole dispute is whether three of the four buildings require railroad trackage and service.

At this point we must describe the buildings briefly. Briley built for his own use a large warehouse on the western part of the tract. This building is served on its west side by a spur track which the Rock Island installed at Briley's expense. There are sliding doors in the west wall of the building, through which goods can be unloaded from freight cars on the spur track. Along the east side of the warehouse is a loading dock for trucks, which Briley uses for the local distribution of produce. It is conceded that this building complies with the contract, in that it admittedly requires railroad trackage and service.

Briley, Ambort, and Gachot each built one of the three smaller buildings, which were placed in a straight line fifty feet from the east boundary of the tract. The fifty-foot strip between these buildings and the edge of the tract was deliberately left vacant so that a railroad spur track could be laid to serve all three buildings; if the track is not installed the strip is wasted. The three smaller buildings are similar to the large Briley building, with sliding doors on the spur track side and truck loading docks on the opposite side.

In April, 1955, all four buildings had been completed and were occupied by four produce dealers—Briley, Ambort, Gachot, and Barker, who had leased Briley's small building. Briley was using his spur track, but the others brought their produce in and out by truck except for occasional rail deliveries over the Briley spur. Briley, apparently considering that the terms of the option

agreement had been met, asked the appellee to convey the second 7.53 acres. The railroad company replied that the conditions had not been fulfilled, as the trackage to the three eastern buildings had not been constructed. Briley then asked that this spur track be installed and offered to pay its cost. The appellee refused to construct the spur, even at Briley's expense, and further stated in its letter of refusal that the installation of the spur track would not constitute compliance with the option, for the reason that none of the occupants of the three buildings "requires rail service or gives any promise of any significant amount of rail traffic."

The dispute centers upon the contract's reference to "a building or buildings . . . requiring railroad trackage and service." Treating the contract as unambiguous and so not subject to explanation by parol evidence, the appellee argues that a mere lifeless building cannot require rail service, so the language should be construed to mean that the buildings must be occupied by tenants who require that service. This argument is ingenious but not really convincing, especially as the appellee prepared the contract and chose to let the participle "requiring" modify the nouns "building" and "buildings." It seems plain enough that certain buildings do *not* require railroad trackage or service, such as dwellings, small stores, service stations, motels, and countless other structures that Briley was obviously precluded from placing on the land if the option was to be exercised. On the other hand, we do no violence to ordinary usage by saying that the Grand Central Station in New York City requires railroad trackage and service if it is to be put to any practical use, and in the same way it is fair to say that three warehouses which were located and built with a view to being easily served by rail require that type of service if they are to be put to their best and most suitable use.

Several considerations persuade us that Briley's interpretation of the agreement is the right one. First, the active verb in the controversial sentence is "construct," which strongly suggests that Briley's duty was

to construct rather than to both construct and find tenants acceptable to the railroad company. Secondly, the appellee's interpretation pretty well makes the clause self-defeating; for Briley cannot obtain the spur track, even at his own expense, until he has tenants that need it, but how is he to obtain those tenants unless he already has the track? Thirdly, to read into the option a condition that the buildings be tenanted gives rise to many unanswered questions, such as how long must the term of a lease be for it to comply with the option agreement, who is to decide whether a tenant requires sufficient railroad service, and so on. If occupancy was to be the test of compliance we should expect these matters to have been dealt with explicitly. We think it reasonable to conclude that the parties simply relied upon the character of the buildings to attract tenants who would need rail service.

Thus if the contract is unambiguous we are of the opinion that Briley has complied with its conditions. That conclusion becomes inescapable if we consider the agreement ambiguous, as it really is, and look to the parties' negotiations for an explanation of what they intended by their written words. *Ben F. Levis, Inc.,* v. *Collins,* 215 Ark. 172, 219 S. W. 2d 762. The parol testimony shows that during the negotiations Briley furnished the railroad with carloading figures for his own business and for that of Ambort, Gachot, and Barker. The weight of the evidence shows that the railroad company understood that these dealers would occupy the buildings and wanted them to accompany Briley to the new location. It also appears that at one point the Rock Island offered Briley a deed to fifteen acres with a clause permitting the grantor to recapture any of the land that was not occupied within five years by terminals or warehouses "requiring railroad trackage and service." When Briley objected to this clause the railway tendered a supplemental agreement which stated in substance that the condition of the proffered deed would be met if the buildings were constructed in accordance with the architect's drawing that we have already referred to. It is

true that Briley refused both the deed and the supplemental agreement, but they are still competent to show that the appellee then placed upon the words ''requiring railroad trackage and service'' substantially the same interpretation as that now contended for by the appellant, and that interpretation was communicated to Briley.

Reversed.